PEKIN LIFE INSURANCE COMPANY, Plaintiff-Appellant, v. SCHMID FAMILY IRREVOCABLE TRUST *et al.*, Defendants-Appellees (Schmid Family Irrevocable Trust, Counterplaintiff; Pekin Life Insurance Company *et al.*, Counterdefendants).

First District (2nd Division)   No. 1—04—1453

───

Opinion filed August 16, 2005.

Robert Marc Chemers and David S. Osborne, both of Pretzel & Stouffer, Chtrd., of Chicago, for appellant.

Marios N. Karayannis, of Brady & Jensen, L.L.P., of Elgin, for appellees.

JUSTICE WOLFSON delivered the opinion of the court:

Plaintiff Pekin Life Insurance Company (Pekin) sought a declaration that it was not required to pay life insurance claims submitted by defendants, the Schmid Family Irrevocable Trust (the Trust) and Nancy Schmid (Nancy). Pekin contended the two policies relied on by defendants were not in effect when the insured, Gustav Schmid (Gustav), died. In response, the defendants filed a countercomplaint against Pekin alleging breach of contract based on two policies they allegedly obtained from Pekin. Defendants also filed a negligence complaint against their insurance broker, Daniel Berlin.

The trial court granted summary judgment in favor of defendants, finding one of the life insurance policies was in effect at the time of Schmid's death. The court also granted Berlin's motion for summary judgment because its finding against Pekin rendered defendants' negligence claims against Berlin moot.

Pekin appeals the trial court's order, contending the policy never was in effect and no contract was formed because defendants never paid the first or any of the other policy premiums. Defendants contend the policy was in effect because they sent Pekin a form authorizing automatic withdrawals from the Trust's bank account to pay the premiums even though Pekin never withdrew any funds. Defendants also contend Pekin never cancelled the policy because it failed to follow the procedures set forth in the policy. Finally, defendants say if this court disagrees with their contentions, we should reverse the trial court's order granting summary judgment to Berlin because their negligence action would no longer be moot. We reverse both summary judgments.

FACTS

Defendant Nancy Schmid applied for a series of three life insurance policies from Pekin. Under the policies, her husband Gustav was insured for $1 million. Nancy applied for each policy through Berlin, her insurance broker.

Berlin's employer, Roland J. Fischer & Associates, had a limited agency agreement with Pekin. That agreement authorized Berlin to

solicit and submit applications for insurance policies, to deliver those policies, and collect the initial premiums.

The first policy Nancy purchased was cancelled in order to name the Trust as the beneficiary. Nancy was the trustee for the Trust. When applying for the second policy, Nancy submitted her application and two money orders totaling $1,442 for the first month's premium. Berlin forwarded the application and premium to Pekin, and policy number 174462 (Policy Two) became effective on September 23, 1997.

On February 2, 1998, Nancy's attorney asked Berlin to cancel Policy Two due to tax implications, paving the way for a new policy to be issued. The attorney's letter stated, "All premium payments in connection with the new policy should come directly from the Trust bank account." Defendants established the account to pay the new policy's premiums.

On February 13, 1998, Schmid executed an application for the new policy (Policy Three). Her application and the attorney's letter requesting cancellation of the Second Policy were received by Pekin on February 18, 1998. No check or money order for the initial premium was submitted with the application.

On February 25, 1998, Pekin sent a copy of Policy Three to Berlin and included a memorandum stating the application had been approved and that the initial premium of $1,700 was due within 15 days.

On March 5, 1998, Nancy gave Berlin a completed form to authorize Pekin to make automatic withdrawals from the Trust's checking account. Pekin's automatic withdrawal system was called "ABS" or the "Check-O-Matic plan." Berlin faxed the form to Pekin on March 11, 1998. That same day, Pekin sent a letter to Berlin as a "FINAL REQUEST" for the first premium of $1,700. In his deposition, Berlin said he "tossed" the March 11 letter without informing defendants.

Berlin delivered Policy Three to defendants. That was the last communication between Berlin and defendants until after Gustav died on August 24, 2000.

On March 13, 1998, Pekin sent a letter to defendants informing them Policy Two had been cancelled, and its premiums had been paid through December 23, 1997. On March 30, 1998, Pekin sent a letter to Berlin stating Policy Three was "not taken" and the amount due was not received. Berlin denied receiving the letter. Defendants never were notified directly that the initial premium on Policy Three never was paid. Each month, Nancy deposited $1,700 into the Trust's bank account, but Pekin never withdrew any money. Although bank statements for the account showed no withdrawals were made, Nancy never opened the statements when she received them in the mail.

After Gustav died, Nancy submitted two claims for life insurance proceeds—one under Policy Two and the other under Policy Three. Upon receiving those claims, Pekin initiated this declaratory judgment action. When Pekin filed its motion for summary judgment, it attached several exhibits including copies of the policy, Pekin's "Life and Health Manual" (the Manual), Diane Steiner's deposition transcript, and Berlin's deposition transcript, among other things.

The Manual contained the rules and regulations for agents who sold Pekin insurance policies, including the following provision:

> "Check-O-Matic Plan—This plan of automatic premium payment may be requested in the application. A Pre-Authorized Check agreement form must be signed by the applicant in the same manner in which he signs his checks. The account from which premiums are to be paid should be clearly identified. *** Since this plan operates only for premiums due after the date the policy is delivered, a remittance to cover the first premium must accompany the application."

Steiner, Pekin's senior underwriter, stated that Pekin has never accepted payment of the initial premium on a policy of life insurance by automatic withdrawal. In the past, when agents requested to make the initial premium payment by automatic withdrawal, she informed them that customers had to pay the initial premium by a traditional method before the automatic withdrawals could be set up on Pekin's computer system.

At Berlin's deposition, he stated he did 85% of his business with Pekin and estimated that he participated in 100 policies during his career. For those policies, he never had used automatic withdrawal to pay for the initial premium. Berlin said that he did not know the initial premium could not be automatically withdrawn. He never consulted the Manual. At the deposition, Berlin read the Manual's Check-O-Matic provision and said it meant the Check-O-Matic plan could not be used to pay the first month's premium. When Berlin submitted the application for Policy Three, he assumed Pekin would allow the Schmids to pay the initial payment by automatic withdrawal because he attached their attorney's letter to their application and believed the application became part of the policy. In the past, Steiner would call him or send a memo if there was a problem with an application. Steiner did not call Berlin about defendants' application. Berlin believed the March 11 letter from Pekin was "inconsequential" because he had just faxed Pekin the authorization form for automatic withdrawal.

On appeal, Pekin contends Policy Three never became a binding contract because the initial premium never was received. Pekin also

contends Policy Two was properly cancelled per the Schmid's written request. Pekin requests this court to find neither policy provided coverage at the time of Gustav's death and reverse the trial court's order.

DECISION

I. Whether Policy Three Was a Binding Contract

This appeal reviews an order granting summary judgment. "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hall v. Henn*, 208 Ill. 2d 325, 328, 802 N.E.2d 797 (2003); 735 ILCS 5/2—1005 (West 2002). We review such orders *de novo*. *Hall*, 208 Ill. 2d at 328.

The first issue we must decide is whether Policy Three was a binding contract absent the payment of the initial premium. If the policy never became a contract, then Pekin's alleged failure to meet its notice provisions for cancellation is irrelevant.

■ A binding contract of insurance is formed " ' "if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the amount, and the rate of insurance are ascertained or understood *and the premium paid if demanded.*" ' " (Emphasis added.) *Zannini v. Reliance Insurance Co. of Illinois, Inc.*, 147 Ill. 2d 437, 454, 590 N.E.2d 457 (1992), quoting *Devers v. Prudential Property & Casualty Insurance Co.*, 86 Ill. App. 3d 542, 544, 408 N.E.2d 462 (1980), quoting *Cottingham v. National Mutual Church Insurance Co.*, 290 Ill. 26, 32, 124 N.E. 822 (1919).

Policy Three states on its first page:

"PLEASE READ YOUR POLICY CAREFULLY. It is a legal contract. We issue it in consideration of the application and payment of the premiums."

The policy's "Premiums" section states:

"You may also maintain regular periodic payments by using automatic check plan. You must pay the initial premium shown on the Specification Page. Subsequent premiums may be paid at our Home Office or to a representative authorized to accept them."

Both parties agree Pekin did not receive any premiums due on Policy Three. The contract is clear—premiums were required as consideration for the policy. Consideration is essential to the formation of a contract. *Chicago Limousine Service, Inc. v. City of Chicago*, 335 Ill. App. 3d 489, 495, 781 N.E.2d 421 (2002). Likewise, Pekin demanded the premiums be paid when it sent its March 11, 1998, letter to Berlin as its "final request."

Defendants contend Pekin received adequate consideration when it received the forms authorizing automatic withdrawal of the premiums from the Trust's bank account, and though Pekin's internal rules required the initial premium to be paid by cash or check, that policy never was disclosed to them. Pekin contends defendants knew about this rule through Berlin, who was acting as their agent. Defendants maintain Berlin was acting as Pekin's agent when he failed to adhere to the rule concerning the initial premium.

■ We must decide whether Berlin was acting as an agent for Pekin or defendants with respect to Policy Three. To do so, we look at the facts of the case to determine whether Berlin was an insurance broker or an insurance agent. Whether a person is an agent or broker usually is a question of fact, but the issue may be decided as a matter of law if the facts clearly show the person acting as a broker is an agent of the insured. *Brandt v. Time Insurance Co.*, 302 Ill. App. 3d 159, 166, 704 N.E.2d 843 (1998).

> " 'A broker is an individual who procures insurance and acts as a middleman between the insured and the insurer, who solicits insurance business from the public under no employment from any special company and who, having secured an order, places the insurance with the company selected by the insured, or in the absence of any selection by the insured, with a company he selects himself. [Citation.] An agent is an individual who has a fixed and permanent relation to the companies he represents and who has certain duties and allegiances to such companies.' " *Zannini*, 147 Ill. 2d at 451, quoting *Krause v. Pekin Life Insurance Co.*, 194 Ill. App. 3d 798, 804-05, 551 N.E.2d 395 (1990).

■ Usually, a broker acts as an agent of the insured, not the insurer. *State Security Insurance Co. v. Burgos*, 145 Ill. 2d 423, 431, 583 N.E.2d 547 (1991). In this case, the parties stipulated to Nancy Schmid's testimony under oath. She stated:

> "That [she] and her late husband, Gustav Schmid, had a relationship with Counterdefendant [Berlin] *** for several years prior to all events in question, in which [Berlin] *acted as the insurance broker* for [the Schmid's] for various types of insurance coverage through insurers other than Pekin.
> * * *
> That with respect to the three policies at issue in this case *** [Nancy] understood that her dealings and communications with Pekin *** regarding the procuring and perfecting of coverage under the aforesaid policies, including but not limited to arranging for the payment of premiums, would be and were conducted through [Berlin].

That [Nancy] understood at all relevant times that [Berlin] was an independent insurance broker authorized to procure life insurance coverage \*\*\* from a number of different insurance companies in addition to Pekin \*\*\*.

\* \* \*

That at no time did [Berlin] represent that he was an employee of Pekin, nor did [Nancy] ever have reason to believe so. That at no time did [Berlin] represent that he was a direct agent for Pekin or authorized to bind Pekin, nor did [Nancy] ever have reason to believe so." (Emphasis added.)

Berlin said in his deposition that he was vice-president and salesperson for Roland J. Fischer & Associates. He sold policies from various life insurance companies. Pekin and Roland J. Fischer & Associates had a written agreement authorizing Roland J. Fischer & Associates to sell Pekin's insurance policies. Berlin said that agreement was in effect when defendants' policies were being discussed. The agreement states:

"The Agent is authorized in behalf of [Pekin] to solicit and submit applications for products as listed on the Schedule of Commissions, \*\*\* to deliver such policies and contracts and to collect the initial premiums therefor, subject to the terms and conditions of this Agreement and the rules and regulations of [Pekin] nor [sic] or hereafter established.

\* \* \*

LIMITS OF AUTHORITY. The Agent is not authorized and is expressly forbidden on behalf of [Pekin] to: (1) incur indebtedness, liability or obligation of any character whatsoever; (2) make, alter or discharge contracts; (3) extend the time or waive the payment of any premium due [Pekin] \*\*\*."

■ Based on these facts, we conclude Berlin was an insurance broker acting as defendants' agent, not Pekin's. As a result, his knowledge of Pekin's regulations and the contents of Pekin's letters to him are imputed to defendants. See *Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 86, 719 N.E.2d 165 (1999) ("[g]enerally, an agent's knowledge is imputed to the principal"); *Western Fire Insurance Co. v. Moss*, 11 Ill. App. 3d 802, 810, 298 N.E.2d 304 (1973) (an insured is charged with his broker's knowledge). To the extent Berlin attempted to submit the authorization forms as a means of paying defendants' initial premium, he was acting beyond the scope of his agreement with Pekin and its rules and could not bind Pekin to Policy Three.

Although Berlin denied knowing the initial premium could not be paid by automatic withdrawal, he admitted the rule was stated in the Manual. His employer kept a copy of the Manual at its offices. Berlin had processed over 100 applications for Pekin insurance policies dur-

ing his career. Defendants' application for Policy Three was the only one he submitted without a check or cash to cover the initial premium. From these facts, we infer Berlin knew or should have known about Pekin's rules regarding the initial premium and automatic withdrawal. Additionally, Berlin received at least two and perhaps three notices that the initial premium for Policy Three had not been paid, although he denied receiving the third notice. These notices to Berlin constitute notice to defendants as well.

Pekin's position is supported by the language of the policy. The "Premiums" section reads: "You must pay the initial premium shown on the Specification Page." After that, the section tells the insured it can pay annual, semi-annual, quarterly, or monthly payments "by using an automatic check plan." The policy does not say the initial premium can be paid by an automatic check plan. Only the subsequent payments can be made that way. The wording is consistent with Pekin's memos to Berlin and the Manual sent to Berlin's company.

We conclude Policy Three never became a binding contract. It lacked consideration. See *Zannini*, 147 Ill. 2d at 454 (a binding insurance policy requires the payment of the demanded premium). Defendants never paid the demanded initial premium to Pekin, despite the fact their agent knew or should have known that the premium could not be paid by automatic withdrawal. Because Berlin did not follow Pekin's rules regarding the initial payment, defendants' application for Policy Three was incomplete and could not bind Pekin to provide coverage. Additionally, without a binding contract, Pekin had no duty to follow the policy's notice provisions for termination. The contract was not terminated—it never was formed.

Defendants also contend their monthly deposits to the Trust's bank account constitute constructive payment of the premiums. We know of no such doctrine under Illinois law. Illinois courts have defined payment as "the delivery of money or its equivalent to the person to whom it is due in satisfaction of an obligation." (Emphasis omitted.) *American Standard Insurance Co. v. Basbagill*, 333 Ill. App. 3d 11, 16, 775 N.E.2d 255 (2002). This definition is not met under these facts, where the deposited money went no further than the Trust's bank account. Defendants admit Pekin never received the funds deposited in the account. A well-known treatise states:

> "An insured cannot rely *** on the fact that he or she gave the insurer a bank authorization form permitting it to draft or otherwise automatically obtain the payment from the insured's account. Although the insured may not have a duty to inspect his or her bank statements to verify that the payments were being automatically withdrawn, he or she does have a duty to pay the

premium, and cannot expect coverage if the premium is not paid."
16 R. Lord, Williston on Contracts § 49.75, at 570 (4th ed. 2000).

We agree with this statement and believe that under the traditional definition of payment, Nancy's deposits to the Trust's bank account do not constitute payment of the necessary premiums to Pekin.

II. The Termination of Policy Two

■ Defendants contend that if Policy Three never was a binding contract, Policy Two was improperly terminated, and they should be granted coverage under the earlier policy. Defendants contend that their request to cancel Policy Two was contingent on the issuance of Policy Three.

Policy Two provides:
> "This policy will terminate on the earliest of these dates:
> - The maturity date,
> - The date of the Primary Insured's death,
> - The end of the grace period,
> - The monthly deduction day following receipt of your written request to terminate."

In February 1998, Berlin forwarded the letter from Schmid's attorney stating, "The existing policy on Gus' life should be cancelled and the new policy issued directly in the name of the Trust." Berlin wrote, "Mr. Schmid would like Pekin to void out the current policy and issue a new policy with a [March 1, 1998,] effective date."

Pekin sent Gustav and Nancy a letter dated March 13, 1998, stating, "Please be advised we have terminated [Policy Two] effective December 23, 1997." According to Berlin, December 23, 1997, was the "paid-to-date" on Policy Two. The Schmids paid no further premiums under Policy Two.

We believe Pekin properly cancelled Policy Two at the Schmids' written request, and the Schmids knew the policy was cancelled. Even though the Schmids were notified that Policy Two was cancelled December 23, 1997, they did not pay any additional premiums to extend the coverage of Policy Two to March 1, 1998—the date they requested Policy Three go into effect. By the time the Schmids received the March 13, 1998, notice of cancellation, they should have known through their agent that no premiums had been paid for Policy Three to become effective. Defendants allowed the gap in coverage. They did not treat the issuance of a new policy as a condition precedent to cancelling Policy Two.

Additionally, the insured, not the insurer, is responsible for determining his insurance needs and maintaining adequate coverage. *Nielson v. United Services Automobile Ass'n*, 244 Ill. App. 3d 658, 663,

666, 612 N.E.2d 526 (1993). Defendants have provided no legal authority for their contention that Pekin owed them a duty to keep Policy Two in effect after their written request for cancellation, especially when the Schmids were not paying the premiums.

For these reasons, we find Policy Two was not in effect when Gustav died. Neither was Policy Three. We reverse the trial court's order granting defendants' motion for summary judgment. We reverse the trial court's order granting Berlin's motion for summary judgment because we believe defendants' counterclaim of negligence against him no longer is moot.

CONCLUSION

We reverse the trial court's order granting summary judgment to defendants. We also reverse its order granting Berlin's motion for summary judgment. We remand this cause to the trial court for further proceedings

Reversed and remanded.

GARCIA and HALL, JJ., concur.